IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06–cv–00103–EWN–KLM

KATHLEEN GREENLEE,

     Plaintiff,

v.

SOUTHWEST HEALTH SYSTEMS, INC.,
d/b/a SOUTHWEST MEMORIAL
HOSPITAL, a Colorado nonprofit
corporation,

     Defendant.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is an employment discrimination case.  Plaintiff Kathleen Greenlee asserts claims against Defendant Southwest Health Systems, Inc. for: (1) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (2006) ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* (2006) (the "ADA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* (2006) (the "ADEA"); (2) breach of three distinct contracts; and (3) promissory estoppel.  This matter is before the court on "Defendant's Motion for Summary Judgment," filed on September 20, 2006.  Jurisdiction is premised upon 28 U.S.C. §§ 1331, 1367 (2006).

**FACTS**

*1.      Factual Background*

Plaintiff began working as a nurse for Defendant, a hospital, in 1973.  (Def.'s Opening Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶ 1 [filed Sept. 20, 2006], *admitted at* Pl.'s Am. Resp. in Opp'n to Def.'s Mot. for Summ. J. [hereinafter "Pl.'s Resp."], Resp. to Def.'s Statement of Undisputed Material Facts [hereinafter "Resp. to SOF"] ¶ 1 [filed Nov. 30, 2006].)  By late 1999 or early 2000, Plaintiff had advanced to a position as Chief Nursing Officer ("CNO") at the hospital.  (*Id.*, SOF ¶ 6; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 6.)  As CNO, Plaintiff sat with other executives, such as the Chief Executive Officer ("CEO"), Chief Financial Officer ("CFO"), and Human Resources Director ("HR Director"), on the hospital's senior leadership team.  (*Id.*, SOF ¶ 7; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 7.)

*a.      Events Leading to Plaintiff's Departure*

On September 8, 2003, then-CEO Bob Peterson informed Defendant's board of directors that he planned to demote Plaintiff based on negative performance evaluations conducted by Quorum Health Resources ("QHR").  (*Id.*, SOF ¶ 39; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 39.)  Defendant contracts with QHR for various services, such as employee evaluations and assistance with hiring CEOs and CFOs.  (*Id.*, SOF ¶ 3; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 3.)

On September 15, 2003, Plaintiff sent a letter to Defendant's grievance committee, asserting that she had been "wrongfully demoted" from her CNO position and requesting an investigation.  (*Id.*, SOF ¶ 41; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 41.)  Nowhere in her letter

did Plaintiff suggest she had experienced any form of discrimination.  (*Id.*, SOF ¶ 42; *admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶ 42; *see* Def.'s Br., Ex. A–19 [9/15/03 Letter].)

On October 6, 2003, Defendant offered Plaintiff a position as "Nurse Educator/Recruiter" with the same salary and benefits as her CNO position as a "good faith gesture."  (*Id.*, SOF ¶ 43; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 43.)  Plaintiff accepted the position.  (*See id.*, SOF ¶¶ 48–49; *admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶¶ 48–49.)

On November 6, 2003, Mr. Peterson resigned.  (*Id.*, SOF ¶ 44; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 44.)  QHR appointed Nelson Toebbe as Defendant's interim CEO.  (*Id.*, SOF ¶ 45; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 45.)  This interim appointment was one step in a complete overhaul of senior leadership at the hospital, in which the CFO, HR Director, and other executive staff were also replaced.  (*Id.*, SOF ¶ 71; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 71.)

### b. *The Second Letter*

On or about January 29, 2004, Plaintiff sent Mr. Toebbe a letter protesting the way in which she "had been treated both before and after [her] wrongful demotion in September of 2003."  (*Id.*, SOF ¶ 50; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 50.)  In the letter, Plaintiff alleged she had been discriminated against based on her gender, age, and disability.  (*Id.*, Ex. A–22 at 2–3 [1/29/04 Letter]; *see also* Pl.'s Resp., Add'l Disputed and Undisputed Facts [hereinafter "Add'l Facts"] ¶ 17; *admitted at* Def.'s Reply Br. in Supp. of Mot. for Summ. J. [hereinafter "Def.'s Reply"], Resp. to Add'l Disputed and Undisputed Facts [hereinafter "Resp. to Add'l Facts"] ¶ 17 [filed Nov. 11, 2006].)  At the end of her letter, Plaintiff stated: "I would be open to discussing a severance package.  Otherwise, I will be forced to pursue my legal options."  (Def.'s Br., SOF ¶

51; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 51.)  Defendant admits the January 2004 letter

constitutes opposition to discriminatory conduct.  (Pl.'s Resp., Add'l Facts ¶ 17; *admitted at*

Def.'s Reply, Resp. to Add'l Facts ¶ 17.)

   *c.*     ***The Third Letter***

   On or about February 17, 2004, Plaintiff's counsel sent a letter to Defendant.  (Def.'s Br.,

SOF ¶ 56; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 56.)  The letter was a step in ongoing

settlement negotiations between Plaintiff and Defendant.[1]  (*Id.*)  In the letter, Plaintiff: (1) rejected

"the six months' severance previously offered to [Plaintiff]" as "wholly inadequate under the

circumstances;" (2) conveyed a "counter-offer of $160,000.00 to resolve [Plaintiff's] legal

claims;" and (3) alleged that Plaintiff had been the subject of various threats and defamatory

statements by Defendant's employees since she first alleged discrimination.  (*Id.*, Ex. A–23 at 2–3

[2/17/04 Letter].)

   *d.*     ***Reaching an Agreement***

   In March 2004, the board's president, Charles Hubbard, participated in negotiations

concerning the amount Defendant would pay Plaintiff to resolve the dispute.  (*Id.*, SOF ¶ 57;

---

[1]Plaintiff objects to the introduction of letter under Federal Rule of Evidence 408, asserting it "is an offer to compromise and 'is not admissible to prove liability for or invalidity of the claim or its amount.'" (Pl.'s Resp., Resp. to SOF ¶ 56 [quoting Fed. R. Evid. 408 (2007)].) However, Rule 408 "is designed to exclude the offer of compromise only when it is tendered as an admission of the weakness of the offering party's claim or defense, not when offered for another purpose." 2 KENNETH S. BROWN, MCCORMICK ON EVIDENCE § 266 (6th ed. 2006). Here, Defendant offers the letter for "another purpose" — *i.e.*, to demonstrate how the parties resolved Plaintiff's discrimination complaint and how that resolution plays into the instant dispute. Plaintiff's objection fails.

*admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶ 57.)  Mr. Hubbard is unaware of any specific communication Defendant made to Plaintiff regarding its desire that she not return to work at the hospital.  (Pl.'s Resp., Add'l Facts ¶ 46; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 46.)

Plaintiff resigned her employment with Defendant effective March 31, 2004.  (Def.'s Br., SOF ¶ 58; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 58; Def.'s Br., Ex. A–24 ¶ 1 [Greenlee Aff.].) Thus, on April 1, 2004, Defendant's in-house counsel sent Plaintiff's counsel a draft agreement titled "Severance Agreement."  (*Id.*, SOF ¶ 59; *admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶ 59.)  This draft agreement provided that Plaintiff would voluntarily resign her employment and that Defendant desired "to provide [Plaintiff] with this Severance Agreement to economically [sic] assist her during her period of transition to other endeavors."  (*Id.*, SOF ¶ 60; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 60.)  On April 1, 2004, Plaintiff's counsel responded with proposed revisions of the draft, removing the above-quoted language and replacing the term "severance" with the term "settlement" throughout.  (*Id.*, SOF ¶¶ 60–62; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 60–62; *see* Def.'s Br., Ex. A–26 at 1 [4/1/04 Draft "Severance Agreement" Redlined by Pl.'s Counsel].)  Counsel for Defendant incorporated the revisions into a draft that he forwarded to Plaintiff's counsel.  (*Id.*, SOF ¶ 63; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 63.)  Neither Mr. Toebbe nor Mr. Hubbard became aware of the changes made by Plaintiff's counsel until after the agreement was executed.  (*Id.*, SOF ¶ 67; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 67.)

After another round of revisions, a final agreement — titled "Settlement Agreement" — was executed (hereinafter the "Agreement").[2]  (*Id.*, SOF ¶ 60–64; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 60–64.)  The Agreement is not dated, but was signed on April 9, 2004.  (*Id.*, Ex. A–30 [Agreement]; Pl.'s Resp., Add'l Facts ¶ 52; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 52.)  The Agreement contains the following material provisions: (1) Defendant would pay Plaintiff $110,000; (2) Plaintiff would resign her employment; (3) Plaintiff would release Defendant from all claims "arising out of [her] employment with, separation of employment from, and relationship of any kind with [Defendant] up to the date of execution of th[e] [] Agreement;" (4) Defendant would not contest "an application for unemployment benefits filed by [Plaintiff];" (5) Defendant would "not to represent to any third party that [Plaintiff was] not eligible for rehire;" and (6) if contacted by prospective employers, Defendant would state only Plaintiff's "dates of employment [and] positions held."  (Def.'s Br., Ex. A–30 at 2–4 [Agreement].)

### e. *Changes at the Hospital*

While settlement negotiations with Plaintiff were ongoing, Defendant was also in the process of interviewing Charles E. Bill to take over as its CEO.  (*Id.*, SOF ¶ 72; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 72.)  Mr. Bill understood that Defendant was looking for "a culture change

---

[2]The parties have spilled copious amounts of ink tediously quibbling over whether the Agreement ought to be characterized as a "severance agreement" or a "settlement agreement." As will become obvious to even the most disinterested reader, given that Defendant bargained to pay a sum of money for Plaintiff's agreement to abandon her allegations *and* resign, the agreement is both a severance agreement *and* a settlement agreement.  This is so regardless of the fact that Plaintiff's counsel, in a noble but futile attempt to trump substance with form, cast the word "severance" out of the agreement — after Plaintiff had *already resigned*.  Thus, I have chosen to refer to the party's accord as the "Agreement."

and a clean slate." (*Id.*) Mr. Bill asserts he learned in an interview that Plaintiff: (1) had a

"dysfunctional relationship" with Defendant's employees; (2) did not work well in the alternate

position to which she had been transferred; and (3) had thus requested a severance agreement.

(*Id.*, SOF ¶¶ 72–73; *admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶¶ 72–73.)

Mr. Bill was hired in April 2004. (*Id.*, SOF ¶ 77; *admitted at* Pl.'s Resp., Resp. to SOF ¶

77.) Mr. Bill decided it was best to recuse himself from the negotiations with Plaintiff in order to

"establish a new culture and not have that baggage." (*Id.*, SOF ¶ 74; *admitted at* Pl.'s Resp.,

Resp. to SOF ¶ 74.) Mr. Toebbe stayed on two or three days after Mr. Bill came on as CEO.

(*Id.*, SOF ¶ 78; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 78.) During these days, Mr. Toebbe

completed the settlement process with Plaintiff and also oversaw the termination of Defendant's

HR Director. (*Id.*, SOF ¶¶ 74, 76; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 74, 76.) As a

consequence of his lack of involvement in the negotiation process, Mr. Bill asserts that prior to

the initiation of the instant litigation, he was unaware that Plaintiff had alleged discriminatory

treatment. (*Id.*, Ex. A–17 at 118 [Bill Dep.].)

When Mr. Bill reviewed the Agreement, he noted it did not contain a provision expressly

precluding Plaintiff from seeking reemployment at the hospital. (*Id.*, SOF ¶ 80; *admitted at* Pl.'s

Resp., Resp. to SOF ¶ 80.) Mr. Bill discussed this fact with Mr. Toebbe, who advised him that

the provision concerning the hospital's desire to assist Plaintiff economically "during her period of

transition to other endeavors" had been removed by Plaintiff's counsel. (*Id.*, Ex. A–14 at 222

[Toebbe Dep.], Ex. A–17 at 60 [Bill Dep.].)

When Mr. Hubbard learned the memorialized agreement did not contain a no-rehire provision, he responded with language unfit "to say in mixed company." (Pl.'s Resp., Add'l Facts ¶ 134; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 134.) Mr. Bill testified: "The fact that [Plaintiff] might want to come back was never really a consideration because she was paid to sever the relationship." (Def.'s Br., Ex. A–17 at 192 [Bill Dep.].) Mr. Bill testified that "it was very clear from [d]ay [one], when I was — before I was hired, that this was a severance agreement and that the board and the interim CEO had every intention of enforcing it [as such]." (Pl.'s Resp., Ex. 7 at 115 [Bill Dep.].)

Shortly thereafter, Defendant hired a new Chief Clinical Officer ("CCO"), Robert Lindberg, and a new HR Director, Sherri Williams. (Def.'s Br., SOF ¶¶ 89–90; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 89–90.) Ms. Williams was aware of the Agreement and advised her staff not to represent to prospective employers that Plaintiff was ineligible for rehire. (*Id.*, SOF ¶¶ 91–92; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 91–92.)

### f. *Plaintiff's Inroads Back the Hospital*

In June 2004, Yvonne Tanner and other nurses at the hospital asked the new CCO, Mr. Lindberg, if Plaintiff could return as a nurse in Defendant's Family Birthing Center ("FBC"). (*Id.*, SOF ¶ 129; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 129.) Mr. Lindberg knew there were "issues with how [Plaintiff] left the organization" and sought clarification from Mr. Bill. (*Id.*, SOF ¶ 131; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 131.) Mr. Bill informed Mr. Lindberg that there was a settlement and Plaintiff was not eligible for rehire. (*Id.*, SOF ¶ 132; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 132.) Ms. Tanner also approached the director of the FBC about rehiring Plaintiff, but

the director declined.  (*Id.*, SOF ¶ 136; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 136.)  In July

2004, Ms. Tanner again approached Mr. Lindberg to request that Defendant rehire Plaintiff, and

Mr. Lindbergh again declined.  (*Id.*, SOF ¶ 137; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 137.)

In August or September 2004, Mr. Bill learned that unnamed hospital employees were

concerned because Plaintiff had been present in the hospital in her capacity as an instructor for a

technical college.  (*Id.*, SOF ¶ 113; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 113.)  These

employees expressed concern that Plaintiff might be trying to get a foot in the door to be rehired.

(*Id.*, SOF ¶ 114; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 114.)  At the time, Mr. Bill advised his

senior leadership team that "there had been a severance agreement and that rehiring [Plaintiff] was

not an option," but that the team would "welcome [Plaintiff] into the institution in [her role with

the technical] college."  (*Id.*, SOF ¶¶ 115–16; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 115–16.)

Mr. Bill also discussed Plaintiff's new position with Mr. Hubbard, and the two confirmed their

understanding that Plaintiff had permanently severed her employment relationship with Defendant.

(*Id.*, SOF ¶ 117; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 117.)

Plaintiff asserts she learned that an unnamed employee of Defendant approached an

unnamed administrator of the technical college and informed him that Defendant's administration

"was upset because Plaintiff was working there [sic]."  (Pl.'s Resp., Add'l Facts ¶ 56; *denied at*

Def.'s Reply, Resp. to Add'l Facts ¶ 56.)  Subsequently, Plaintiff met with Mr. Lindberg, who

assured her that she was welcome at the hospital in her capacity as an instructor and that he had

heard good things about her.  (*Id.*, Add'l Facts ¶ 57; *admitted at* Def.'s Reply, Resp. to Add'l

Facts ¶ 57; Def.'s Br., SOF ¶ 119; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 119.)

Ms. Tanner asserts that, in October 2004, she approached Mr. Lindberg while he was on rounds and once again broached the subject of rehiring Plaintiff.  (Def.'s Br., SOF ¶ 138; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 138.)  Ms. Tanner asserts that this time, Mr. Lindberg said "okay." (*Id.*)

Thereafter, Ms. Tanner contacted Plaintiff, who submitted an application for a relief nurse position in the FBC on September 15, 2004.[3]  (*Id.*, SOF ¶¶ 139, 143; *admitted in relevant part at* Pl.'s Resp., Resp. to SOF ¶¶ 139, 143.)  Based on a conversation with Ms. Tanner, Plaintiff expected to be hired by Defendant.  (Pl.'s Resp., Add'l Facts ¶ 79; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 79.)  Plaintiff gave up "two other nursing positions with other employers" based on her expectation that she would be hired by Defendant.  (*Id.*, Add'l Facts ¶ 87; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 87.)

### g.    *Defendant's Response to Plaintiff's Application*

Ms. Williams learned Plaintiff had submitted an application when her assistant asked her to set a wage for Plaintiff.  (Def.'s Br., SOF ¶ 147; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 147.) Plaintiff's application raised a "red flag" for Ms. Williams because she knew that there was an agreement severing Plaintiff's employment relationship with Defendant.  (*Id.*, SOF ¶ 148; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 148.)  When Ms. Williams asked Mr. Lindberg whether

---

[3]This date indicates that Ms. Tanner incorrectly recalled the date upon which Mr. Lindberg finally assented.  (*See* Def.'s Br., Ex. A–35 at 198 [Tanner Dep.] [stating Mr. Lindberg approved Plaintiff's hire in October 2004].)

he had cleared Plaintiff to return to Defendant's employ, Mr. Lindberg advised her that he had

not.  (*Id.*, SOF ¶¶ 149–50; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 149–50.)

Subsequently, Ms. Williams contacted Mr. Bill concerning the application and Mr. Bill

told her that Plaintiff would not be rehired.  (*Id.*, SOF ¶¶ 151–52; *admitted at* Pl.'s Resp., Resp.

to SOF ¶¶ 151–52.)  In addition to the severance agreement, Mr. Bill also weighed the fact that

"the pre-existing senior leadership team had been totally dismantled in order to facilitate an

atmosphere that would lead to a culture change and a clean slate, moving forward for [sic] the

organization.  You can't do that if you've got the old leadership still floating around."  (*Id.*, SOF

¶ 153; *denied at* Pl.'s Resp., Resp. to SOF ¶ 153; Def.'s Br., Ex. A–17 at 192–93 [Bill Dep.].)[4]

In an executive meeting, Mr. Bill discussed Plaintiff's application with Mr. Lindberg, CFO Dan

Jessup, and Ms. Williams.  (Pl.'s Resp., Add'l Facts ¶ 154; *admitted at* Def.'s Reply, Resp. to

Add'l Facts ¶ 154.)  Mr. Bill summarized the thrust of the discussion as such: "What part of

'severance' doesn't [Plaintiff] understand?  Under no circumstances is she rehirable here."  (*Id.*)

On or about September 24, 2004, Ms. Williams contacted Plaintiff and told her that the

hospital did not wish to enter into an employment relationship with her.  (Def.'s Br., SOF ¶ 154;

*admitted at* Pl.'s Resp., Resp. to SOF ¶ 154.)  In deposition, Plaintiff asserted that when she

---

[4]Plaintiff denies this testimony, asserting that "Mr. Bill does not say that this factor had anything to do with the decision not to rehire Ms. Greenlee."  (Pl.'s Resp., Resp. to SOF ¶ 153 [citing Pl.'s Resp., Add'l Facts ¶ 136].)  In support, Plaintiff points the court to Mr. Bill's testimony that: "It was very clear from day [one], when I was — before I was hired, that this was a severance agreement and that the board and the interim CEO had every intention of enforcing it as [such]."  (*Id.*, Add'l Facts ¶ 136 [quoting Pl.'s Resp., Ex. 7 at 115 (Bill Dep.)].)  The cited testimony does not undermine Defendant's asserted fact.

asked Ms. Williams if she was eligible for rehire, Ms. Williams stated: "that's just something that we — that we would tell other hospitals — it's only on paper — and not here.  At this institution, you're not eligible."  (Pl.'s Resp., Ex. 14 at 218 [Greenlee Dep.].)  In an affidavit, Plaintiff asserted that Ms. Williams told her she could not be rehired based on her "past history."  (*Id.*, Ex. 2 ¶ 27 [Greenlee Aff.].)

After the decision not to rehire Plaintiff was made, Mr. Hubbard approached Ms. Williams and asked her whether Plaintiff had applied for a job.  (*Id.*, Add'l Facts ¶ 99; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 99.)  Mr. Hubbard told Ms. Williams that there was a severance agreement with Plaintiff and that neither he nor anyone on the board wanted Plaintiff rehired.  (*Id.*, Add'l Facts ¶ 100; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 100.)

In a regularly scheduled meeting at approximately the same time, Mr. Bill informed Mr. Hubbard that: (1) Plaintiff had submitted an application; (2) he intended to enforce the severance agreement; and (3) he did not intend to bring Plaintiff back to the hospital.  (Def.'s Br., SOF ¶ 158; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 158.)  Mr. Bill also informed the entire board of his decision at a regular October 2004 board meeting.  (*Id.*, SOF ¶ 160; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 160.)

At about the same time, Messrs. Bill and Hubbard may have had another conversation about Plaintiff's application.  (Def.'s Br., Ex. A–17 at 122 [Bill Dep.].)  Mr. Hubbard may have reiterated his view that the Agreement precluded Plaintiff's return.  (Pl.'s Resp., Add'l Facts ¶ 162; *admitted in relevant part at* Def.'s Reply, Resp. to Add'l Facts ¶ 162.)

### h.    Formal Charge and Determination

Plaintiff filed an Equal Employment Opportunity Commission ("EEOC") charge on March

2, 2005.  (Def.'s Br., SOF ¶ 164; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 164.)  On September

12, 2005, the EEOC issued a letter of determination finding there was probable cause that

Defendant had violated Title VII, the ADEA, and the ADA by denying Plaintiff employment in

retaliation for her previous complaints of gender, age, and disability discrimination.  (Pl.'s Resp.,

Add'l Facts ¶ 182; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 182.)

### 2.    Procedural History

On January 20, 2006, Plaintiff filed a complaint in this court, alleging: (1) retaliation under

Title VII, the ADA, and the ADEA; (2) breach of the Agreement; (3) breach of contract to rehire;

and (4) promissory estoppel.  (Compl. [filed Jan. 20, 2006].)  On May 25, 2006, Plaintiff filed an

amended complaint, adding a claim for breach of Defendant's "Rehiring of Former Employees

Policy."  (Am. Compl. [filed May 25, 2006].)  On June 5, 2006, Defendant filed an answer to the

amended complaint.  (Def.'s Answer to Pl.'s Am. Compl. [filed June 5, 2006].)

On September 20, 2006, Defendant filed a motion for summary judgment, arguing: (1)

Plaintiff cannot prove a *prima facie* retaliation claim; (2) Plaintiff's breach of contract claim based

on the Agreement fails because Defendant did not make any external representations about

Plaintiff's eligibility for rehire; (3) Plaintiff's contract and estoppel theories based on the hospital's

rehiring policies fail because such policies were not mandatory; and (4) Plaintiff's breach of

contract claim based on Defendant's failure to rehire her fails because Ms. Tanner lacked

authority to hire Plaintiff and also because the essential terms of Plaintiff's reemployment were

never agreed upon.  (Def.'s Br.)  On October 10, 2006, Plaintiff filed her response brief.  (Pl.'s

Resp. in Opp'n to Def.'s Mot. for Summ. J. [filed Oct. 10, 2006].)  On November 10, 2006,

Defendant filed its reply brief.  (Def.'s Reply.)

On November 28, 2006, Plaintiff asked for leave to file an amended response brief, which

corrected pervasive spelling errors in her original brief.  (Unopposed Mot. to Correct

Typographical Error [sic] [filed Nov. 28, 2006].)  That day, the court granted Plaintiff's motion.

(Minute Order [filed Nov. 28, 2006].)  On November 30, 2006, Plaintiff filed her amended

response brief.  (Pl.'s Resp.)  This matter is fully briefed.

## ANALYSIS

### 1.   *Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant

summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is no genuine issue as to any material

fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)

(2007); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc.

v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the

initial burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex

Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the

burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material

matter."  *Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving

party may not rest solely on the allegations in the pleadings, but must instead designate "specific

facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P. 56(e) (2007). A fact in dispute is "material" if it might affect the outcome of the suit under the governing law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a verdict for the nonmoving party. *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing *Anderson*, 477 U.S. at 248). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985). The factual record and reasonable inferences therefrom are viewed in the light most favorable to the party opposing summary judgment. *Byers v. City of Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

**2.      *Evaluation of Claims***

**a.      *Retaliation***

Title VII, the ADA, and the ADEA prohibit an employer from discriminating against a former employee based upon her prior opposition to gender, age, or disability discrimination. 42 U.S.C. §§ 2000e–3(a), § 12203(a) (2006); 29 U.S.C. § 623(d) (2006); *see Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (holding that former employees may recover under Title VII's anti-retaliation provision); *Flannery v. Recording Indus. Ass'n of Am.*, 354 F.3d 632, 642 (7th Cir. 2004) (construing ADA and ADEA anti-retaliation provisions to protect former employees).

There are two evidentiary routes to proving a claim for retaliation. Typically, a plaintiff must rely on circumstantial evidence, and the familiar burden-shifting framework of *McDonnell Douglas* applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800–07 (1973); *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005). However, "[t]he *McDonnell Douglas* test is

inapplicable where the plaintiff presents direct evidence of discrimination." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).

### *(1)     Direct Evidence*

Direct evidence is evidence that, if believed, proves the existence of a fact in issue without inference or presumption. *Mitchell v. City of Wichita*, 140 F. App'x 767, 778 (10th Cir. 2005). Plaintiff emphasizes Defendant's so-called admission "that it refused to rehire [Plaintiff] because she had entered into [the] Agreement with [Defendant]." (Pl.'s Resp. at 53.) Then, Plaintiff asserts "since the [] Agreement constitutes 'protected activity' under the law, Defendant's refusal to rehire [her] for this reason is direct evidence of retaliation" that merits denial of summary judgment. (*Id.*) This is sheer gibberish. Plaintiff fails to grasp the concept of direct evidence, mistaking what *might* be construed as indirect evidence of retaliation as direct evidence thereof. Further, Plaintiff oversimplifies Defendant's position.

Defendant asserts it understood the Agreement as one that would permanently sever relations between itself and Plaintiff. (Def.'s Br. at 27.) As Plaintiff herself admitted, Mr. Bill repeatedly represented that Plaintiff "was not eligible for rehire because there was a settlement agreement" — not because Plaintiff had opposed sex, age, or disability discrimination. (Def.'s Br., SOF ¶ 132; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 132; *see also* Def.'s Br., SOF ¶¶ 148, 158; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 148, 158.) While the Agreement lacks a provision directly precluding Plaintiff from seeking reemployment with Defendant, Mr. Bill testified, "[t]he fact that [Plaintiff] might want to come back was never really a consideration because she was paid to sever the relationship." (*Id.*, Ex. A–17 at 192 [Bill Dep.].) Thus, it is Defendant's

position that its *understanding* of the Agreement — rather than the fact that Plaintiff had opposed discrimination — motivated its rejection of Plaintiff's application.

Hence, Defendant's "admission" that it refused to rehire Plaintiff based on its understanding of the Agreement does not constitute evidence which, if believed, proves without inference that Plaintiff suffered retaliation because she previously opposed discrimination. *See Alvariza v. Home Depot*, 2007 U.S. Dist. LEXIS 17685, at *20 (D. Colo. Mar. 14, 2007) ("[A] statement that requires one or more *inferences* to be made before it might be interpreted as discriminatory is not *direct* evidence of discrimination." [emphases in original]).  Rather, to come out in Plaintiff's favor, Defendant's "admission" requires the factfinder to *infer* from the evidence that Defendant's understanding of the Agreement is untenable and, therefore, a desire to retaliate was the true motivation for its refusal to rehire Plaintiff.  Because an inference of retaliation is the hallmark of a case premised on indirect evidence, further evaluation of Plaintiff's case must proceed under the *McDonnell Douglas* scheme.

### (2)    *Indirect Evidence*

*McDonnell Douglas* requires the aggrieved employee to establish a *prima facie* case of retaliation, consisting of evidence that: (1) the plaintiff engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and (3) a causal connection existed between the protected activity and the materially adverse action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 [2006]); *see Metzler v. Fed. Home Loan Bank*, 464 F.3d 1164, 1171 (10th Cir. 2006) (noting the Tenth Circuit has

-17-

extended *White*, a case analyzing Title VII retaliation, to ADEA and ADA retaliation claims). The "burden of establishing a *prima facie* case . . . by a preponderance of the evidence" is "not onerous." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 922 (10th Cir. 2001).

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to come forward with a legitimate nondiscriminatory reason for its employment-related decision. *See McDonnell Douglas*, 411 U.S. at 802. Upon the employer's articulation of a legitimate nondiscriminatory reason, a plaintiff must "present[] evidence that the defendant's proffered reason for the employment decision was pretextual — *i.e.* unworthy of belief." *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1230 (10th Cir. 2000) (citation and quotation marks omitted).

Turning to the instant case, with respect to the first element of Plaintiff's *prima facie* case, Defendant argues that Plaintiff's entry into the Agreement does not constitute protected opposition to discrimination. (Def.'s Br. at 26–28.) Defendant does not discuss whether Plaintiff can satisfy the second element of a *prima facie* retaliation claim, so the court will assume without deciding that she can. (*See id.*) With respect to the final element, causation, Defendant asserts Plaintiff has failed to come forward with any evidence suggesting that an intent to retaliate motivated its decision not to rehire her. (*Id.* at 25–31.) I consider each of Defendant's arguments in turn.

### (a)      Protected Conduct

Defendant argues: "[N]o court has reached so far as to hold that entry into a severance or settlement agreement, particularly one requested by the plaintiff, establishes protected

opposition . . . ." (*Id.* at 27.)  Thus, Defendant concludes: "[b]ecause entry into a severance

agreement is not protected opposition, [Defendant's] reliance upon that agreement as the basis

not [sic] to rehire [Plaintiff] does not offend the anti-retaliation provisions" of Title VII, the ADA,

or the ADEA.  (*Id.*)  For good measure, Defendant tosses in a prudential argument: "[t]o hold

otherwise would enable every employee that [sic] receives a requested severance package to set

the stage for a subsequent retaliation action." (*Id.* at 27–28.)

     In turn, Plaintiff points out that settlement agreements are routinely viewed by courts as

protected conduct.  (Pl.'s Resp. at 54.)  Plaintiff also asserts that Defendant has attempted to

draw an "artificial line" between the resolution of formal EEOC proceedings and the internal

resolution of informal complaints.  (*Id.* at 55.)  Finally, Plaintiff attempts to rebuff Defendant's

prudential argument, noting that in the "standard severance situation, the employee has not

asserted discrimination claims" against her former employer.  (*Id.* at 56.)  As set forth below,

Plaintiff has the law and facts on her side.

     I first address Defendant's assertion that while making formal allegations of discrimination

constitutes protected opposition, the settlement of informal claims of discrimination does not.[5]

(*See* Def.'s Br. at 26–27.)  This is illogical.  If alleging discrimination constitutes protected

opposition, then negotiating and securing a settlement that resolves such allegations must also

constitute protected opposition.  *See Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir.

---

[5]Defendant does not argue that Plaintiff's allegations of discrimination were made in bad
faith.  *See Zinn v. McKune*, 143 F.3d 1353, 1362 (10th Cir. 1998) (stating that plaintiff claiming
to have engaged in protected activity "must have had a reasonable good faith belief that defendant
was engaging in discrimination").

2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."); *Miller v. Fairchild Indust., Inc.*, 797 F.2d 727, 731–32 (9th Cir. 1986) (finding plaintiffs' participation in EEOC settlement constituted protected activity); *see also Wells v. Colo. Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir. 2003) (indicating that lawsuit to enforce settlement of discrimination claims constituted protected activity).  Although Defendant attempts to downplay the role Plaintiff's allegations of discrimination played in its decision to sever its relationship with her, when construed in the light most favorable to Plaintiff, the evidence supports the reasonable conclusion that Defendant would not have entered into negotiations, paid Plaintiff a $110,000 "settlement," and signed the Agreement absent Plaintiff's allegations of discrimination.  If, as Defendant appears to contend, Plaintiff was performing poorly prior to her allegations of discrimination, Defendant would have had legitimate grounds for firing her then, but Defendant's own allegations reveal that it did not attempt to sever its relationship with her until *after* she alleged discrimination.  (*See* Def.'s Reply at 66; Def.'s Br., SOF ¶¶ 50–53, 56–70.) That the release in the Agreement was comprehensive rather than targeted solely at allegations of discrimination does not suggest otherwise.  (*See* Def.'s Reply at 66; Def's Br., A–22 [1/29/04 Letter].)  Obviously, it was in Defendant's best interest to secure the broadest possible waiver of claims.

Defendant suggests that *Miller* and similar cases are distinguishable from the instant case because the *Miller* plaintiffs remained continuously employed following the execution of agreements settling their claims against the employer.  (Def.'s Reply at 65.)  One need look no further than the plain language of Title VII, the ADA, and the ADEA to dispel this argument: "It

shall be an unlawful employment practice for an employer to discriminate against . . . *employees*

*or applicants for employment* . . . because [they] ha[ve] opposed any practice made an unlawful

employment practice by this title." 42 U.S.C. § 2000e–3 (2006) (emphasis added); *see* 29 U.S.C.

§ 623(d) (2006) (employing substantially similar language); 42 U.S.C. § 12203(a) (2006)

(employing broader language). What matters for the purpose of each these statutes is whether an

employer discriminated against an employee or applicant based on such person's past opposition

to discriminatory conduct. 29 U.S.C. § 623(d); 42 U.S.C. §§ 2000e–3, 12203(a). Whether an

employment relationship continues or is severed after an employee engages in protected conduct

is irrelevant — the statutes apply to present employees, former employees, and applicants alike.

*See Robinson*, 519 U.S. at 346; *Flannery*, 354 F.3d at 642.

With respect to Defendant's prudential argument — that to hold a severance agreement

constitutes protected opposition would "enable every employee that [sic] receives a requested

severance package to set the stage for a subsequent retaliation action" — the court is confident

that only a select few severance agreements present such a problem. Those select few share two

features: (1) they sever an employment relationship with an employee who has alleged unlawful

discrimination; and (2) they lack language expressly barring the former employee from attempting

to rekindle the employment relationship. The court is confident that Defendant will never again

enter into an agreement like the one at issue in this case.

### (b)    *Causation*

Next, Defendant argues that no causal connection exists between its decision not to rehire

Plaintiff and her engagement in protected conduct. (Def.'s Br. at 28–31.) In response, Plaintiff

asserts: (1) Mr. Bill knew or should have known of Plaintiff's protected conduct; (2) because the "subordinate bias" doctrine precludes an employer from "pleading ignorance on the part of the nominal decision-maker," Defendant cannot escape liability by arguing that Mr. Bill merely followed "the biased recommendations" of his predecessor or the board; and (3) close temporal proximity exists between Plaintiff's protected conduct and Defendant's refusal to rehire her. (Pl.'s Resp. at 57–69.)  After pausing to outline the law concerning causation, I consider each argument in turn.

"The causal-connection element of a *prima facie* retaliation claim requires the employee to show that the employer's motive for taking adverse action was its desire to retaliate for the protected activity."  *Wells*, 325 F.3d at 1218; *accord Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1320–21 (10th Cir. 1999) (requiring some evidence that employer undertook adverse employment action for purpose of retaliation), *overruled on other grounds by AMTRAK v. Morgan*, 536 U.S. 101 (2002).  Obviously, where the person who takes adverse action against a plaintiff was unaware of the plaintiff's protected conduct, causation is lacking.  *See Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).  Nevertheless, a causal connection may be shown "by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action."  *O'Neal v. Ferguson Constr. Co.*, 237 F.3d 1248, 1253 (10th Cir. 2001) (quotation omitted).  However, "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation."  *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (emphasis in original).

### *(i)      Awareness of Protected Conduct*

Defendant argues Mr. Bill did not know that Plaintiff had engaged in protected conduct and, thus, could not have retaliated against her for same.  (Def.'s Br. at 28–29.)  Citing to *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002), Plaintiff argues that Defendant is *liable* because, as "the person who performed the retaliatory acts," Mr. Bill "knew, or should have known, of the facts constituting protected activity."  (Pl.'s Resp. at 59.)

In order for an action to constitute retaliation for protected conduct, the actor must *know* an employee previously engaged in protected conduct.  *Rice*, 983 F.2d at 181.  But knowledge alone will not suffice.  *See generally Kelly v. Drexel Univ.*, 94 F.3d 102, 109 (3d Cir. 1996) (rejecting view that *prima facie* case may be proven "merely by demonstrating some adverse action against the individual and that the employer was aware that the employee" was in a protected class).  There must also be evidence giving rise to a reasonable conclusion that the actor's motive for taking adverse action was his *desire to retaliate* for the protected activity. *Wells*, 325 F.3d at 1218; *Bullington*, 186 F.3d at 1320–21.  Thus, even if Plaintiff can prove that Mr. Bill was *aware* that she had opposed discriminatory conduct, she will have only moved causation only one step forward, as she must still furnish competent evidence indicating that such knowledge impelled retaliation.

Hence, Plaintiff's assertion that Defendant must be held liable if Mr. Bill "should have known" of her protected conduct must be rejected.  First, liability does not rest on knowledge alone.  Second, there is no such thing as unintentional or negligent retaliation.  In support of her contention to the contrary, Plaintiff cites to *Foster*, a case in which the Tenth Circuit stated:

> To establish a causal connection, a plaintiff must establish that the individual or individuals who actually undertook the alleged retaliatory acts were aware or should have been aware of plaintiff's participation in the protected activity. *See Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1265 (10th Cir. 1998) (holding that a retaliatory discharge claim must be predicated on intentional and knowing retaliation); *see also Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999); *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 797 (9th Cir. 1982).

293 F.3d at 1193. The cases *Foster* cites do not support its articulation of a "should have been aware" standard of knowledge.[6] *See Gunnell*, 152 F.3d at 1265 (requiring actual knowledge on the part of an employer of retaliatory acts of non-supervisory coworkers); *Fenton*, 174 F.3d at 832 ("[P]laintiff must show that the defendant knew of her exercise of this protected activity."); *Cohen*, 686 F.2d at 797 (stating that supervisor's lack of knowledge of employee's protected activity undermined causation).

In *Rice*, the Tenth Circuit unequivocally held: "We have previously assumed, without deciding, that to establish a 'causal connection,' [a] plaintiff must show that the individual who took adverse action against him *knew of the employee's protected activity*. We embrace th[is] assumption . . . in our holding today." 983 F.2d at 181 (citation omitted; emphasis added); *accord Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1188 (10th Cir. 2002); *Ostler v. Anderson*, 200 F. App'x 750, 752 (10th Cir. 2006); *Webb v. Level 3 Comm., LLC*, 167 F. App'x 725, 735 (10th Cir. 2006); *but see EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 487–88 (10th Cir. 2006) (endorsing subordinate bias doctrine, discussed *infra*), *cert. dismissed*, 127 S.

---

[6]Further, *Foster* is not a Title VII, ADA, or ADEA case, but instead employs the *McDonnell Douglas* scheme to decide whether the plaintiff had been retaliated against for availing herself of Kansas workers compensation protections. 293 F.3d at 1191.

Ct. 1931 (2007).  Thus, *Foster*'s "should have known" standard is an anomaly.  The standard is

inconsistent not only with the cases upon which *Foster* purports to rely, but also with broader

Tenth Circuit precedent.  I decline to apply such an unfounded standard here.  Consequently, to

make out her *prima facie* case, Plaintiff must furnish evidence that Mr. Bill knew she engaged in

protected conduct.

Although the evidence on this issue is "very thin and purely circumstantial," I find that the

evidence and logical inferences flowing therefrom could reasonably support Plaintiff's assertion

that Mr. Bill's testimony concerning his lack of knowledge of Plaintiff's protected conduct is not

fully credible.  *See Anderson v. Phillips Petroleum Co.*, 861 F.2d 631 (10th Cir. 1988).  Plaintiff

is correct that the timing of her complaints of discrimination and the settlement thereof coincides

with the start of Mr. Bill's tenure as CEO.  (*See* Def.'s Br., Ex. A–17 at 59–60 [Bill Dep.].)

Indeed, within the first two or three days of his tenure, Mr. Bill read the Agreement and discussed

it with Messrs. Toebbe and Hubbard.  (*See id.*; Pl.'s Resp., Ex. 5 at 230–31 [Hubbard Dep.].)

While it is possible that no one ever mentioned to Mr. Bill that Plaintiff had complained of

discrimination, a reasonable juror might view testimony to that effect with justifiable skepticism.

*See Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) (noting that "courts

must be quite circumspect in evaluating the movant's factual averments when evidence bearing on

a particular matter lies within the exclusive possession of the party seeking summary judgment"

[citation and internal quotation marks omitted]).  I emphasize that this is a close call, but, given

the light in which summary judgment evidence must be viewed, the posture of the evidence, and

the ample opportunities Mr. Bill had to learn about Plaintiff's allegations, I find that a genuine

issue of fact exists with regard to whether Mr. Bill knew that Plaintiff had engaged in protected

conduct.  As noted above, however, knowledge alone is insufficient to support a finding that

adverse action was motivated by a "desire to retaliate for the protected activity."  *Wells*, 325 F.3d

at 1218.  Thus, I proceed to address Plaintiff's arguments bearing on this key aspect of causation.

### *(ii)*     *Subordinate Bias*

With a tacit nod to her failure to uncover any evidence of discriminatory intent on the part

of Mr. Bill, Plaintiff argues Defendant ought to be held liable under the "subordinate bias"

doctrine because Mr. Toebbe and the board "are the actual decision-makers here, and [Mr.] Bill

simply rubber-stamped their decision" not to rehire Plaintiff.  (Pl.'s Resp. at 56.)  Defendant

contends that the doctrine is inapposite and only applies where "a biased subordinate, who lacks

decision-making power, uses the formal decision-maker as a dupe in a deliberate scheme to

trigger a discriminatory employment action."  (Def.'s Reply at 68.)

Both parties purport to rely on *BCI*, 450 F.3d at 487–88, cited *supra*.  In *BCI*, the Tenth

Circuit generalized: "subordinate bias claims simply recognize that many companies separate the

decisionmaking function from the investigation and reporting functions, and that racial bias can

taint any of those functions."  450 F.3d at 488; *see* Recent Case, *Tenth Circuit Clarifies*

*Causation Standard for Subordinate Bias Claims*, 120 HARV. L. REV. 1699, 1699 (2007)

("Subordinate bias liability helps foster a nondiscriminatory workplace by giving employers the

incentive to review the recommendations and conclusions of supervisors for correctness and

legitimacy before making decisions.").  Thus, the circuit court cited favorably to decisions

recognizing that an employer may be held liable either: (1) where "a biased subordinate, who lacks

decisionmaking power, uses the formal decisionmaker as a dupe in a deliberate scheme to trigger

a discriminatory employment action;" or (2) where "a decisionmaker gives perfunctory approval

for an adverse employment action explicitly recommended by a biased subordinate." *BCI*, 450

F.3d at 484 (citing *Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 [11th Cir. 1998];

*Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 288 [4th Cir. 2004]).

 To prevail on a subordinate bias claim, a plaintiff must establish that a "biased

subordinate's discriminatory reports, recommendations, or other actions caused the adverse

employment action" in question. *Id.* at 487 (citing *Lust v. Sealy, Inc.*, 383 F.3d 580, 584 [7th Cir.

2004]). The causal link is defeated when the "employer has taken care not to rely exclusively on

the say-so of the biased subordinate." *Id.* at 488.

 Even assuming that the subordinate bias doctrine ought to be extended to a case where a

CEO agrees with an assessment made by both his predecessor *and* his company's board of

directors, Plaintiff has failed to invoke the doctrine satisfactorily. First, Plaintiff argues: "[a]

reasonable jury could infer that [Mr. Toebbe and the board] had a retaliatory motive, given that

they had received [Plaintiff's] January [29, 2004] discrimination complaint, and knew that she had

accused them of discriminating against her." (Pl.'s Resp. at 59.) Were there evidence that

Plaintiff had indeed accused Mr. Toebbe or the board of discrimination, this argument might have

a leg on which to stand. *See Wells*, 325 F.3d at 1217 (finding evidence supporting an inference of

bias where person who fired the plaintiff "was specifically accused of discrimination in her EEOC

complaint" and had learned of such accusations four weeks prior); *cf. BCI*, 450 F.3d at 489

(finding evidence that the supervisor who recommended adverse action against the plaintiff had

made "many raced-based remarks," including racial jokes and insults, raised an issue of fact concerning his bias). However, the only accusations of discrimination contained in the January 29, 2004 letter are as follows: (1) former CEO Bob Peterson and former HR Director Neal Price told Plaintiff that former CFO George Brisson "did not like [her] because [she is] a woman [and] because [she] opposed his decisions that affected the quality of patient care;" (2) Mr. Peterson encouraged Plaintiff to step down from her CNO position, "suggesting that the job was 'too stressful' for [her] given her age and . . . heart condition;" and (3) Plaintiff felt that because she fell into "the expensive 'menopause to Medicare' age bracket for the purposes of insurance costs, . . . Mr. Price and other [senior executives] recommended that [Defendant] devise a strategy to weed out employees with physical conditions."  (Def.'s Br., Ex. A–22 at 2–3 [1/29/04 Letter].)[7]  Thus, Plaintiff's argument falls flat.

---

[7]Although Plaintiff made further allegations in the letter, none can reasonably be stretched to relate to her retaliation claim.  However, one line of accusations does relate to the board, so I air it here.  Plaintiff alleged that when Mr. Brisson was fired, he vowed he would "'get rid of [Plaintiff]' because he believed that [she] was responsible for his termination."  (Def.'s Br., Ex. A–22 at 2 [1/29/04 Letter].)  Plaintiff asserted "she ha[d] reason to believe" that Mr. Brisson passed on false information about her to the board, which ultimately resulted "in the decision of a few [b]oard members to recommend that [she] be removed from [her] CNO position."  (Id.)  Plaintiff further alleged that this unnamed group of "a few [b]oard members" acted "well outside the scope of their authority by . . . involving themselves in [] personnel matters, calling 'board' meetings inappropriately and failing to prepare minutes, representing themselves as 'the board' to third parties, and telling community members that [Plaintiff] had been terminated (which was untrue)."  (Id.)  Plaintiff's vague accusations cannot serve as a proxy for allegations that the board discriminated against her based on her gender, age, or disability.  Even if they could, their failure to identify any specific board members serves to distance them from the person-specific allegations relied on in Wells.  See 325 F.3d at 1217.

Even if it did not fail for lack of evidence of bias, I find that no reasonable juror would infer that Mr. Toebbe or the board made any "discriminatory reports, recommendations, or other actions." *See BCI*, 450 F.3d at 487.   It is beyond dispute that Plaintiff herself requested severance and resigned before the finalization of a severance agreement.   In her January 2004 letter, Plaintiff stated: "I would be open to discussing a severance package.   Otherwise, I will be forced to pursue my legal options."   (Def.'s Br., Ex. A–22 at 3 [1/29/04 Letter].)   Plaintiff's counsel worked to secure a severance on her behalf and, indeed, rejected "six months' severance" as "wholly inadequate."   (*See id.*, Ex. A–23 at 2 [2/17/04 Letter].)   Further, Plaintiff testified that she resigned on March 31, 2004 and *then* signed the Agreement on April 9, 2004.   (*Id.*, Ex. A–24 ¶ 1 [Greenlee Aff.]; Pl.'s Resp., Ex. 2 ¶ 12 [Greenlee Aff.].)   Significantly, Plaintiff's counsel did not attempt to recharacterize Defendant's draft "Severance Agreement" as a "Settlement Agreement" until *after* Plaintiff had already resigned.   (Def.'s Br., Ex. A–26 at 1 [4/1/04 Draft "Severance Agreement" Redlined by Pl.'s Counsel].)   Further, the finalized Agreement itself is unequivocally predicated on Plaintiff's *relinquishment* of her position with Defendant.   (*Id.*, Ex. A–30 at 1 [Agreement].)   Additionally, one would have to read out provisions of the Agreement in order to conclude that it was *not* intended to sever permanently the parties' relationship — the Agreement explicitly states: "[Defendant] agrees not to represent to any party that [Plaintiff] is not eligible for rehire.   If contacted by prospective employers regarding [Plaintiff], [Defendant] shall state her dates of employment as well as positions held."   (*Id.*, Ex. A–30 at 3 [Agreement].)   Thus, to the extent Mr. Bill could be said to have relied on Mr. Toebbe's or any board member's opinion that

Plaintiff was ineligible for rehire, Plaintiff has failed to come forward with evidence suggesting

that such an opinion was unreasonable — let alone retaliatory.

Even if Plaintiff's subordinate bias theory did not suffer the aforementioned fatal

infirmities, it would still fail.  Plaintiff did not furnish evidence suggesting that any

communications made by Mr. Toebbe or the board "caused the adverse employment action" in

question.  *BCI*, 450 F.3d at 487.  The undisputed evidence reveals that Mr. Bill took care not to

rely exclusively on the say-so of Mr. Toebbe or the board, thus defeating causation.  *See id.* at

488.  Specifically, Plaintiff herself alleges that when Mr. Bill learned of her application for

reemployment, he convened a meeting with Mr. Lindberg, Mr. Jessup, and Ms. Williams.  (Pl.'s

Resp., Add'l Facts ¶ 154; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶ 154.)  Mr. Bill

summarized the extent of the discussion as such: "What part of 'severance' doesn't [Plaintiff]

understand?  Under no circumstances is she rehirable here."  (*Id.*)  Mr. Bill's testimony indicates

that he consulted neither Mr. Toebbe — who had long since departed from his employ with

Defendant — nor any member of the board before convening this meeting.  (*See* Def.'s Br., Ex.

A–17 at 112 [Bill Dep.].)  Indeed, when Mr. Bill subsequently met with Mr. Hubbard, Mr. Bill

told him that "[he] was planning on reinforcing [sic] the severance with [Plaintiff]."  (*Id.*, Ex.

A–17 at 113 [Bill Dep.].)  Furthermore, Mr. Bill testified that he would not rehire *any* of the

members of the leadership team that preceded him because the "team had been totally dismantled

in order to facilitate an atmosphere that would lead to a culture change and a clean slate, moving

forward for [sic] the organization.  You can't do that if you've got the old leadership still floating

around."  (*Id.*, Ex. A–17 at 192–93 [Bill Dep.].)  None of this suggests that Mr. Bill was either a

pawn or a rubber stamp acting at the behest of Mr. Toebbe or the board.  Although he clearly

agreed with Mr. Toebbe and the board that Plaintiff would not be considered for reemployment,

reasoned agreement and unthinking affirmance are *not* one and the same.  The undisputed facts

reveal that Mr. Bill exercised his own judgment in deciding the fate of Plaintiff's application.  *See*

*BCI*, 450 F.3d at 488.  In light of all of the foregoing, it is overwhelmingly clear that the doctrine

of subordinate bias does not here obtain.

### *(iii)*   *Temporal Proximity*

Defendant argues that the temporal gap between Plaintiff's protected activity and its

decision not to rehire her belies an inference of retaliatory motive.  (Def.'s Br. at 28–31.)  Plaintiff

asserts that the absence of close temporal proximity is ameliorated by the fact that Defendant

decided it would not rehire her long before she applied for a job.  (Pl.'s Resp. at 63.)  Plaintiff

then attempts to use evidence of pretext to buttress her proximity arguments.  (*Id.* at 64–69.)  I

consider Plaintiff's more traditional approach first, and then address her attempt to integrate

pretext evidence into her *prima facie* case.

(A) CLOSE PROXIMITY — A retaliatory motive may be inferred when an adverse action

closely follows protected activity.  *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996).

However, unless the retaliation is very closely connected in time to the protected activity, the

plaintiff must rely on additional evidence beyond temporal proximity to establish causation.

*Coors Brewing*, 181 F.3d at 1179; *compare Ramirez v. Okla. Dep't of Mental Health*, 41 F.3d

584, 596 (10th Cir. 1991) (one and one-half month period between protected activity and adverse

action may, by itself, establish causation), *with Richmond v. ONEOK, Inc.*, 120 F.3d 205, 209

(10th Cir. 1997) (three-month period, standing alone, is insufficient to establish causation).

In the instant case, the parties entered into the Agreement on April 9, 2004.  (Pl.'s Resp.,

Ex. 2 ¶ 12 [Greenlee Aff.].)  Plaintiff's application for reemployment was denied on or about

September 24, 2004.  (Def.'s Br., Ex. A–24 ¶ 6 [Greenlee Aff.].)  Thus, more than five months

passed between the protected activity and the alleged incident of retaliation.  The latter can hardly

be said to have "closely followed" the former.  *See Richmond*, 120 F.3d at 209.  Plaintiff must

therefore rely on further evidence to establish causation.  *Coors Brewing*, 181 F.3d at 1179.

Plaintiff points to *Wells*, a case in which the court acknowledged that "[a] five-month gap

between a protected activity and an adverse action would ordinarily be too great a time lapse to

support an inference of causation based on timing alone," but went on to find that the "unique

circumstances" of the case warranted a divergence from the general rule of close temporal

proximity.  325 F.3d at 1217.  In *Wells*, the plaintiff alleged two distinct instances of retaliation, a

demotion and a termination.  *Id.* at 1216–19.  The first instance is relevant here, and the second

will be addressed in the next subsection.  With respect to the demotion, the *Wells* plaintiff filed a

charge of discrimination and then promptly took a five-month leave of absence to recover from

the stress created by the dispute that gave rise to her charge.  *Id.* at 1211, 1217.  Within a week of

her return from leave, her supervisor transferred her from her job as an engineer to a position

counting cars on a street corner.  *Id.* at 1211.  From this evidence, the court concluded a jury

could reasonably draw an inference of retaliatory intent.  *Id.* at 1217.

While the five-month gap between protected conduct and adverse action in the instant case is similar to the gap in *Wells*, further differences between *Wells* and this case counsel against finding that the "unique circumstances" of that case support a similar determination here. As discussed above, the *Wells* plaintiff: (1) filed a charge; (2) went on leave; (3) returned five months later; and (4) was promptly transferred to a demeaning job. Here, it is undisputed that Plaintiff: (1) was demoted from her CNO position; (2) wrote a letter complaining about the demotion, but failed to mention any discrimination; (3) accepted a job with the same salary and benefits as her CNO position as a "good faith" gesture; (4) shortly thereafter, wrote a letter complaining of discrimination and requesting severance; (5) resigned; (6) negotiated a $110,000 payment in exchange for, *inter alia*, her resignation and agreement to forgo any legal claims; (7) started a new job; (8) applied for a job with Defendant five months later, notwithstanding job offers for similar positions with two other employers; and (9) was denied employment by Defendant. (Def.'s Br., SOF ¶¶ 39, 41–43, 50, 58, 113, 154; *admitted at* Pl.'s Resp., Resp. to SOF ¶¶ 39, 41–43, 50, 58, 113, 154; Pl.'s Resp., Add'l Facts ¶¶ 52, 87; *admitted at* Def.'s Reply, Resp. to Add'l Facts ¶¶ 52, 87; *see* Def.'s Br., Ex. A–30 at 3 [Agreement].)  Even viewing these undisputed facts in the light most favorable to Plaintiff, I find that they fail to support a reasonable inference of retaliation with regard to Defendant's refusal to rehire Plaintiff.

Plaintiff makes a novel argument in an attempt to evade the requirement that "unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation." *Coors Brewing*, 181 F.3d at 1179 (emphasis in original).  Plaintiff contends that the board made its decision not to rehire

her just after she resigned and, consequently, "[t]he fact that [Mr.] Bill did not carry out the [b]oard's intent until after [Plaintiff] submitted her application five months later is irrelevant." (Pl.'s Resp. at 62–63.)  Plaintiff neglects to cite the record in support of her assertions.[8]  (*See id.*)  Even assuming that record does support her otherwise conclusory allegations, this argument is fatally premised on Plaintiff's failed subordinate bias argument — I have already determined that Plaintiff neglected to present evidence of the board's bias, let alone evidence that Mr. Bill unthinkingly acted thereupon.  (*See Analysis* § 2a[2][b][ii], *supra*.)  Moreover, as discussed immediately below, Plaintiff has failed to come forward with any evidence suggesting that Defendant's proffered reason for denying Plaintiff reemployment is pretextual.  (*See id.* § 2a[2][b][iii][B], *infra*.)  Instead, the court is left only with Plaintiff's speculation that Mr. Bill — a corporate officer who recused himself from the negotiation of the Agreement in order to start his job with a "clean slate" — refused to rehire Plaintiff in order to smite her for leveling accusations of discrimination at people whose tenure at the hospital predated his own.  *See Wells*, 325 F.3d at 1217 (noting that "anger and resentment [is] the motive for retaliation"); *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988) (stating that "mere conjecture . . . is an insufficient basis for denial of summary judgment").

(B)  PROXIMITY PLUS PRETEXT — I begin by returning to *Wells* and then specifically engage Plaintiff's arguments.  After the *Wells* plaintiff was demoted from her engineering job to the traffic-counting position, she filed a charge of discrimination with the EEOC and promptly

---

[8]"Unsupported conclusory allegations . . . do not create an issue of fact."  *Salehpoor v. Shahinpoor*, 358 F.3d 782, 789 (10th Cir. 2004).

took a second leave of absence at the behest of her doctor.  325 F.3d at 1212.  When the

plaintiff's leave time expired, her supervisor sent her a letter informing her she had been

terminated.  *Id.*  Because the evidence revealed that the plaintiff's termination took place almost

eight months after her EEOC complaint, the court could not rest on proximity between protected

conduct and adverse action, and instead focused on evidence suggesting the supervisor only

learned of the protected conduct one to three months prior to the termination.  *See id.* at 1217;

*see also Coors Brewing*, *supra*.  Thus, the court emphasized that the "special circumstances" of

the case warranted a closer look at the evidence, noting that the supervisor had been "specifically

accused of discrimination" in the plaintiff's EEOC complaint and had terminated her "[a]s soon as

he had a plausible basis for taking action against [her]."  325 F.3d at 1217.  Additionally, the

*Wells* court noted that evidence undermining the supervisor's stated reason for termination

supported causation.  *Id.* at 1217–19.  Although the supervisor claimed he fired the plaintiff

because she had exhausted her leave without providing a medical release allowing her to return to

work, the plaintiff presented evidence that: (1) she had informed him that she was ready to return

to work; (2) she had submitted a medical form indicating she would be able to return to work

when an appropriate position opened; and (3) such a position had, in fact, opened, but she had not

been informed of it.  *Id.* at 1218–19.  The court also noted that when the plaintiff's first leave of

absence was winding down, the supervisor had sent her a letter asking that she return to work,

but when the plaintiff's second leave wound down, the supervisor allowed the leave to run out

and then fired her.  *Id.* at 1219.  Thus, while the timing between the events alone did not support

an inference of causation, because the plaintiff had shown the supervisor's "proffered reason for

taking adverse action [wa]s false, the factfinder could infer that the employer was lying to conceal

its retaliatory motive." *Id.* at 1217–18; *Mickelson v. N.Y. Life Ins. Co.*, 460 F.3d 1304, 1317 &

n.7 (10th Cir. 2006).

Such is not the case here.  First, Plaintiff never accused Mr. Bill of any discriminatory

actions.  *Cf. Wells*, 325 F.3d at 1217.  Second, Mr. Bill did not take adverse action against

Plaintiff "[a]s soon as he had a plausible basis for taking action against [her]."  *Cf. id.*  Instead,

when Plaintiff returned to the hospital in her capacity as an instructor for the technical college,

Mr. Bill told his executive team that "we would welcome her into . . . the institution in the role of

preceptor through the college [and] would not interfere with that."  (Def.'s Br., SOF ¶ 116;

*admitted at* Pl.'s Resp., Resp. to SOF ¶ 116; Def.'s Br., Ex. A–17 at 77 [Bill Dep.].)  Had Mr.

Bill harbored a retaliatory motive, he most certainly had a "plausible basis" for attempting to act

then to prevent Plaintiff from returning to the hospital as an instructor.  But he did not.  It strains

credulity to think that Mr. Bill instead had the invidious foresight to bide his time, to wait for

Plaintiff (who had a new job) to submit an application for employment with Defendant

(notwithstanding her prior request for severance and resignation), and then to retaliate.  To accept

Plaintiff's implicit theory of the case is to accept that Mr. Bill employed a Rube Goldberg

approach to retaliation, when a direct strike was possible.  No reasonable juror would give any

credence to such a fantastic theory.

Thus, the instant case is so distinct from *Wells* that it seems unwise to accept, as Plaintiff

encourages the court to do, that this case presents similar "special circumstances" counseling in

favor of delving into Plaintiff's pretext arguments at the *prima facie* stage.  This is particularly so,

where, as here, the court has reviewed those arguments and discovered each and every one to be frivolous.  Despite the obvious differences between this case and *Wells*, and despite the harrowing prospect of grinding through each of Plaintiff's spurious pretext arguments, the court, in the interest of putting this case to rest once and for all, will air those arguments in order to reveal the full extent of the infirmities of Plaintiff's case.

First, Plaintiff appears to argue that because the Agreement does not include a provision expressly barring her from being rehired, Defendant's reliance on the Agreement as a basis for denying her application for reemployment is pretextual.  (Pl.'s Resp. at 64–65.)  In support, Plaintiff points to a provision in the Agreement in which Defendant "promised that it would not represent 'to *any* party' that [Plaintiff] was ineligible for rehire."  (*Id.* [emphasis in original].)  Thus, Plaintiff apparently reads the provision to prohibit Defendant from telling *her* that she is ineligible for reemployment.  (*See id.*)  Of course, this is nonsense.  In its entirety, the provision upon which Plaintiff attempts to tack this absurd reading states:

> [Plaintiff and Defendant] agree . . . neither shall make any adverse, derogatory or disparaging remarks to any *third party* about the other party . . . .  [Defendant] agrees to provide [Plaintiff] with a copy of the media release [concerning this settlement] for her approval prior to the same being released.  [Defendant] agrees not to represent to any party that [Plaintiff] is not eligible for rehire.  If contacted by prospective employers regarding [Plaintiff], [Defendant] shall state her dates of employment as well as positions held.

(Def.'s Br., Ex. A–30 at 3 [Agreement] [emphasis added].)  Only through the foggy lens of self delusion could one interpret the promise "not to represent to any party that [Plaintiff] is not eligible for rehire" to actually include representations made by Defendant to Plaintiff herself.  If the provision evinces any mutual understanding between the parties, it is that Plaintiff would *not*

be eligible for rehire — otherwise there would be no reason for Defendant to promise "not to represent" to others that Plaintiff "is not eligible for rehire." *See generally Town of Estes Park v. N. Colo. Water Conservancy Dist.*, 677 P.2d 320, 326 (Colo. 1984) (stating that courts tasked with contract interpretation are required to give effect to all of the instrument's provisions). While the Agreement does lack an express provision barring Plaintiff from seeking reemployment, in light of (1) the above-cited provision, (2) Plaintiff's request for severance and resignation, (3) Mr. Bill's stated intent not to rehire any member of the previous executive team, and (4) the absence of evidence of retaliatory intent, the court cannot find that Defendant's stated reason for refusing to rehire Plaintiff is "so inconsistent, implausible, incoherent, or contradictory that it is unworthy of belief." *Stover v. Martinez*, 382 F.3d 1064, 1071 (10th Cir. 2004).

Second, Plaintiff asserts that Defendant's decision not to rehire her ran counter to its internal policies and practices. (Pl.'s Resp. at 65.)  Plaintiff contends that Defendant violated a written policy that states "[e]ligibility for rehiring will be based on [] former employees' performance and whether or not they gave proper notice." (*Id.*; *see* Def.'s Br., Ex. A–11 [Policy: Rehiring of Former Employees].)  Again, Plaintiff's interpretation is strained to the point of absurdity.  In Plaintiff's view, thanks to this narrowly drafted, narrowly focused provision, the two listed factors are the *only* factors Defendant could consider in deciding whether to rehire a former employee.  According to Plaintiff, any former high-performing employee who had given adequate notice of her departure would be a shoo-in for reemployment with Defendant. *But see* Warren Hoge, *British Inquiry Finds Doctor Killed 215 of His Patients*, N.Y. TIMES, July 20,

2002, at A4 (noting doctor's "reputation for attentive and trustworthy medical care"). No reasonable juror would join in this cramped view.

Similarly, Plaintiff argues that the manner in which Defendant handled her application deviated from Defendant's "Applicant Screening and Referral Policy," which Plaintiff claims to provide that "it is up to the individual departments in the [h]ospital to select applicants for hire." (Pl.'s Resp. at 65.) Plaintiff also points to Ms. Tanner's testimony that in her thirty years with the hospital, she had "never seen human resources refuse to hire a qualified nurse in her unit who had been selected for hire by the department, except for [Plaintiff]." (*Id.*) Further, Plaintiff complains that it was a "disturbing procedural irregularit[y]" for Ms. Williams to discuss Plaintiff's application with Mr. Bill and Defendant's in-house counsel, since it was not her normal practice to do so. (*Id.* at 66.) Even assuming that Plaintiff's characterization of the hospital's policies and practices is accurate, each of the "irregularities" to which she points is precariously premised upon the far-fetched assumption that policies and practices targeted at the general run of applicants should trump the views of the CEO and other executives with regard to a former employee who the company had paid *to resign.* While Plaintiff may entertain the fantasy that she ought to have been treated just like any other applicant for employment, given the circumstances of her prior departure, the mere fact that she was not so treated does not begin to suggest that Defendant's proffered reason for refusing to rehire her is pretextual.

The parade of unavailing arguments lurches on. Plaintiff next asserts that Defendant had previously rehired a former employee, Edie Brewer, with whom it had entered into a settlement agreement. (*Id.* at 65.) Plaintiff notes, however, that Ms. Brewer did not complain of gender,

age, or disability discrimination, suggesting that this fact indicates Defendant's real reason for not

rehiring Plaintiff was to retaliate against her for engaging in protected conduct.  (*Id.*)  On its face,

Plaintiff's allegation appears troubling.  *See Kendrick*, 220 F.3d at 1232 (noting that a pretext

finding is supported by evidence that the plaintiff was treated differently from other non-protected

employees who engaged in similar conduct).  However, a review of the evidence reveals that

Plaintiff is long on *chutzpah* and short on record support.  In her deposition, Ms. Williams

discussed the Brewer settlement:

> Q:   And what type of [claim] was Ms. Brewer alleging?
> A:   She was saying it was an [Family and Medical Leave Act ("FMLA")] violation.
> *   *   *
> Q:   And she had been terminated; is that correct?
> A:   Correct.
> Q:   And she believed that her termination violated the [FMLA]?
> A:   Correct.
> Q:   What ended up happening with Ms. Brewer's claim?
> A:   We brought her back to the hospital.
> Q:   So there was a settlement?
> A:   Yes.
> Q:   And ***as a part of the settlement, she was returned to work at the hospital***; is that correct?
> A:   Correct.
> Q:   She did not apply for rehire?
> A:   No.

(Pl.'s Resp., Ex. 11 at 114–15 [Williams Dep.] [emphasis added].)  Although the court has

considered issuance of a Rule 11 show-cause order so that counsel for Plaintiff can explain how

the *vast* disconnect between the evidence and counsel's argument came to be, the court prefers

not to waste any more of its limited time and resources on this stuff.

Plaintiff also suggests the fact that Mr. Bill discussed with Mr. Hubbard whether Plaintiff was to be allowed to return runs contrary to policy because the board "had no authority to involve itself in personnel matters concerning [Defendant's] employees other than the CEO and CFO." (*Id.* at 66.)  As discussed above, Plaintiff's application for reemployment was not a run-of-the-mill "personnel matter."  Rather, it implicated the Agreement — an agreement that was indisputably within the purview of board members.  (*See* Def.'s Br., Ex. A–30 at 4 [Agreement] [bearing the signature of Mr. Hubbard on behalf of Defendant].)  Plaintiff's argument fails.

Plaintiff takes a fourth stab at pretext, arguing that Defendant has "asserted a number of conflicting *post hoc* reasons for its refusal to hire [Plaintiff] which are contradicted by the evidence."  (Pl.'s Resp. at 66–68.)  Plaintiff then tosses out this forehead slapper:

> Although Defendant now claims that [Plaintiff] was not rehired because of the [] Agreement, when [Plaintiff] initially asked [Ms.] Williams why the [h]ospital refused to rehire her, she was told that she was not going to be rehired based on her "past history."  No mention was made of the [] Agreement.

(*Id.* at 66 [citations omitted].)  First, Plaintiff's own testimony reveals that Ms. Williams alluded to the Agreement in their conversation.  (*Id.*, Ex. 14 at 218 [Greenlee Dep.].)  Moreover, it is undisputed that, when Plaintiff's application came in, it raised a "red flag" for Ms. Williams because she knew that there was an agreement severing Plaintiff's employment relationship with the hospital.  (Def.'s Br., SOF ¶ 148; *admitted at* Pl.'s Resp., Resp. to SOF ¶ 148.)  Given that (1) the Agreement was finalized prior to Plaintiff's application for reemployment, and (2) Ms. Williams immediately realized that Plaintiff's application for reemployment ran counter to the Agreement, the court is at an utter loss as to how Ms. Williams' broad reference to "past history"

is inconsistent with Defendant's present position.[9]  Even when viewed in the forgiving light cast

upon a nonmoving party's summary judgment evidence, Ms. Williams' alleged reference to "past

history" cannot reasonably be read to suggest pretext.

      Fifth, Plaintiff asserts that defense counsel represented to the EEOC that it is not

Defendant's policy "to rehire an individual after entering into severance of [sic] agreement."

(Pl.'s Resp. at 66.)  Plaintiff contends that this position is inconsistent with Ms. Williams'

statement that "no such policy exists."  (*Id.*)  Even assuming that defense counsel's

representations to the EEOC are somehow binding on Defendant — a proposition for which

Plaintiff offers no support whatsoever[10] — this argument is wholly unavailing.  First, the

statement Plaintiff attributes to defense counsel merely appears to be an exasperated nod to the

absurdity of having to defend a claim for retaliation brought by a former employee who requested

and received severance and, nonetheless, then turned around to reapply for a job.  Moreover, it is

difficult to imagine why a business would ever draft a formal written policy against rehiring

---

      [9]Plaintiff failed to recall Ms. Williams' reference to "past history" during her May 2, 2006 deposition, in which she merely recalled Ms. Williams' statement that Plaintiff was only eligible for rehire "on paper. . . .  At this institution, you're not eligible."  (*See* Pl.'s Resp., Ex. 14 at 218 [Greenlee Dep.].)  Instead, Plaintiff recalled the alleged "past history" statement for the first time in her October 10, 2006 affidavit.  (*Id.*, Ex. 2 ¶ 27 [Greenlee Aff.].)  Interestingly, something else happened on October 10, 2006: Plaintiff filed her summary judgment response.  The court can only imagine what sort of "pretext" inferences a jury might draw from this.

      [10]A party's failure to cite any authority "suggests either that there is no authority to sustain its position or that it expects the court to do its research."  *Rapid Transit Lines, Inc. v. Wichita Developers, Inc.*, 435 F.2d 850, 852 (10th Cir. 1970).

parties with whom it has entered into severance agreements. Common sense would dictate that such a policy ought to be unnecessary.

Next, Plaintiff points to statements made by defense counsel in a scheduling order and a preliminary pretrial order, which she insists are inconsistent with record evidence. (*Id.* at 67–68 & n.8.) Plaintiff then asserts that such representations are binding on Defendant. (*Id.*) Defendant points out that: (1) the scheduling order was submitted to the court prior to initiation of discovery in this case; and (2) the preliminary pretrial order was submitted after only four of the twenty-two depositions in this case had been conducted. (Def.'s Reply at 78.) Defendant further argues that such statements do not constitute judicial admissions. (*Id.*) In support of her argument that they do, Plaintiff points to *Frank v. Bloom*, a case in which the Tenth Circuit held: "[t]he factual matter contained in the pleadings is admissible as an admission by a party made by his agent acting within the scope of his employment." 634 F.2d 1245, 1251 (10th Cir. 1980). Then, Plaintiff asserts that scheduling and preliminary pretrial orders constitute pleadings. (Pl.'s Resp. at 68 n.4.) Nonsense.

Federal Rule of Civil Procedure 7 lists five types of documents that constitute pleadings: complaints, answers, answers to cross-claims, third-party complaints, and third-party answers. Fed. R. Civ. P. 7(a) (2007). Indeed, in both of the cases Plaintiff cites in support of her fanciful position, the pleading at issue was the answer. *Bloom*, 634 F.2d at 1251; *Mo. Housing Dev. Com. v. Brice*, 919 F.2d 1306, 1314 (8th Cir. 1990). As any first-year law student ought to know, in an answer, a defendant responds to the averments in a plaintiff's complaint by admitting, denying, or — most importantly for present purposes — stating that it is "without knowledge or information sufficient to form a belief as to the truth" of the averment. Fed. R. Civ. P. 8(b)

(2007).  In contrast, in a scheduling order, counsel merely attempts to outline the positions it expects to develop through the course of discovery.  *See* D.C.COLO.LCivR 16.2, App. F (2007).  A preliminary pretrial order serves similar purposes.  *See id.* 16.3, App. G.  While it is logical to bind a party to its admissions in an answer since those admissions will likely influence the scope of discovery, it makes no sense to bind a party to the preliminary statements of counsel in documents whose purpose is to apprise the court of the anticipated trajectory of a case.  Consequently, it would be improper for the court to consider such preliminary statements as evidence bearing upon summary judgment.

Finally, Plaintiff argues "the court should take into account" that the EEOC previously issued a letter of determination finding reasonable cause to believe Plaintiff's claim that she was subjected to retaliation.  (Pl.'s Resp. at 68–69.)  Plaintiff neglects to point out how the EEOC's letter of determination gives rise to a genuine issue of fact.  (*See id.*)  After reviewing the letter, I find that it does not.  The letter merely states that "[e]xamination of the evidence reveals reasonable cause" to believe Plaintiff's claims, but the letter fails to indicate  — or even intimate — what said evidence was.  (*Id.*, Ex. 1 at 1 [Letter of Determination].)  The Tenth Circuit has stated: "when the independent facts before the district court judge fail to establish a genuine issue of material fact, a favorable EEOC letter of determination does not create one." *Simms v. Okla. ex rel. Dep't of Mental Health*, 165 F.3d 1321, 1331 (10th Cir. 1999).  Such is the case here.

Because Plaintiff has failed to provide any evidence suggesting a causal link between the rejection of her application for reemployment and her protected activity, I find that she has failed

to establish a *prima facie* case of retaliation.  Additionally, I find Plaintiff has failed to come

forward with evidence suggesting that Defendant's proffered legitimate nondiscriminatory reason

is pretextual.  In light of her case's failure at both the first and third stages of *McDonnell*

*Douglas*, summary judgment on Plaintiff's ADA, ADEA, and Title VII claims is warranted.

> **b.    State Law Claims**

Plaintiff's federal claims provided the sole basis for this court's original jurisdiction over

this case.  (Am. Compl. ¶ 2.)  Plaintiff's remaining claims for relief arise under state law.  (*See id.*

¶¶ 41–63.)  Plaintiff alleges that the parties are not diverse.  (*Id.* ¶¶ 5–6.)  Thus, were Plaintiff's

state law claims to remain before this court, they would do so solely on the basis of supplemental

jurisdiction.  *See* 28 U.S.C. § 1367 (2006).  "Notions of comity and federalism demand that a

state court try its own lawsuits, absent compelling reasons to the contrary."  *Thatcher Enters. v.*

*Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990).  In the instant case, I perceive no

inefficiencies or unfairness in requiring Plaintiff to bring her state law claims in the forum best-

suited to adjudicating them, the state courts.  *See id.*; 28 U.S.C. § 1367(c)(3) (2006) (stating a

district court "may decline to exercise supplemental jurisdiction over a claim" if it "has dismissed

all claims over which it has original jurisdiction"); *United Mine Workers of Am. v. Gibbs*, 383

U.S. 715, 726 (1966) (stating "if the federal claims are dismissed before trial . . . the state claims

should be dismissed as well").  Consequently, I bow to comity and decline to exercise

supplemental jurisdiction.

> **3.    Conclusion**

Based on the foregoing it is therefore ORDERED that:

1.      DEFENDANT's motion (#59) is GRANTED in part and DENIED in part.

Defendant's motion is granted with respect to Plaintiff's federal claims.  This court

declines to exercise jurisdiction over Plaintiff's pendant state law claims.

2.      The clerk shall forthwith enter judgment in favor of Defendant and against

Plaintiff, dismissing Plaintiff's first, second, and third claims for relief with

prejudice.  The judgment shall dismiss Plaintiff's fourth, fifth, sixth, and seventh

claims for relief without prejudice, in order to allow for refiling in state court.

3.      Defendant may have its costs by filing a bill of costs within eleven days of the date

of this order.

Dated this 9th day of August, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge

1